IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

No. 18-cv-60379 Moore



FEDERAL TRADE COMMISSION,

    Plaintiff,

    v.

THOMAS DLUCA, individually and also d/b/a Bitcoin Funding Team and My7Network,

LOUIS GATTO, individually and also d/b/a Bitcoin Funding Team and My7Network,

ERIC PINKSTON, individually and also d/b/a Bitcoin Funding Team and My7Network, and

SCOTT CHANDLER, individually and also d/b/a Bitcoin Funding Team and Jetcoin,

    Defendants.

(FILED UNDER SEAL)

**COMPLAINT FOR PERMANENT INJUNCTION
AND OTHER EQUITABLE RELIEF**

Plaintiff, the Federal Trade Commission ("FTC"), for its Complaint alleges:

1. The FTC brings this action under Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), to obtain temporary, preliminary, and permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief for Defendants' acts or practices in violation of

Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), in connection with the advertising, marketing, and promotion of purported money-making schemes.

## JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a) and 1345, and 15 U.S.C. §§ 45(a) and 53(b).

3. Venue is proper in this district under 28 U.S.C. §§ 1391(b)(3) and (c)(1), and 15 U.S.C. § 53(b).

## PLAINTIFF

4. The FTC is an independent agency of the United States Government created by statute. 15 U.S.C. §§ 41-58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.

5. The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act and to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies. 15 U.S.C. §§ 53(b) and 56(a)(2)(A).

## DEFENDANTS

6. Defendant Thomas Dluca was a founder and promoter of a chain referral scheme operating under the name "Bitcoin Funding Team" and a promoter of another chain referral scheme operating under the name "My7Network." At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint. Defendant Dluca, in

2

connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

7. Defendant Louis Gatto was a promoter of Bitcoin Funding Team and of My7Network. At all times material to this Complaint, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint. Defendant Gatto resides in this district and, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

8. Defendant Eric Pinkston was a promoter of Bitcoin Funding Team and of My7Network. At all times material to this Complaint, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint. Defendant Pinkston, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

9. Defendant Scott Chandler was a promoter of Bitcoin Funding Team and another purported money-making scheme, "Jetcoin." At all times material to this Complaint, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint. Defendant Chandler, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

## COMMERCE

10. At all times material to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' BUSINESS PRACTICES

11. Since at least February 2017, Defendants, individually or in concert, have promoted a series of purported money-making schemes involving cryptocurrencies, including "Bitcoin Funding Team," "My7Network," and "Jetcoin."

### Bitcoin Funding Team

12. Bitcoin Funding Team was a web-based chain referral scheme founded by Defendant Dluca in or around February 2017 and promoted by Defendants Dluca, Gatto, Pinkston, and Chandler until the operation announced its closure in August 2017. Defendants promoted Bitcoin Funding Team as a means for consumers to generate income and accumulate wealth by purchasing and donating bitcoin currency to earlier "upline" participants and by recruiting others to do the same. The scheme offered no products or services. Income was derived solely through payments by later participants.

13. Participants of Bitcoin Funding Team earned revenue by building two downlines of recruits who enrolled as participants and paid upline donations. In order to participate in Bitcoin Funding Team, a consumer made an initial .1 bitcoin ("btc") donation to an upline participant and paid a platform fee of .008 btc to Bitcoin Funding Team directly, purportedly to cover the costs of administration. The value of bitcoin in U.S. dollars fluctuates significantly; at the time Bitcoin Funding Team launched, one bitcoin was worth approximately $1000, so the cost of entry at that time was approximately $100.

14. Upon payment of the donation and platform fee, the consumer acquired the right to recruit additional participants and to receive donations from those recruited. The consumer also received access to the Bitcoin Funding Team platform—a web-based program that tracked participants' recruits and rewards.

15. Bitcoin Funding Team operated as a chain referral scheme. A new participant (identified as "P") who paid the initial donation and the platform fee recruited two additional participants into a downline position, which became P's Level 1. Each of these two participants in turn recruited two more downline participants who similarly paid upline donations and platform fees, resulting in four new participants at P's Level 2. Participant P continued to build a downline through Level 3 (eight new participants), Level 4 (16 new participants), Level 5 (32 new participants), and so on. A screenshot from a promotional video illustrates the organization structure, which resembled a pyramid:



16. Payment of the platform fee and initial .1 btc donation entitled P to receive the initial .1 btc donations from P's two Level 1 recruits. In order to potentially receive additional rewards beyond Level 1, P was required to "upgrade" by paying additional bitcoins to P's upline. To potentially earn rewards from the four participants at Level 2, P paid an additional .2 btc; to potentially earn Level 3 rewards from the eight participants at Level 3, P paid an additional .4

5

btc. Level 4 rewards required an additional 1.0 btc payment, and Level 5 rewards required an additional 2.0 btc payment. While participants could develop unlimited downlines, they could only receive rewards from participants at Levels 1 through 5.

17. A participant who upgraded and paid the additional bitcoins only received the *potential* to receive rewards from a given level; the participant would only receive donations from downline members who had similarly upgraded to the same level. For example, a participant who paid an additional .2 btc to access Level 2 rewards would only realize additional rewards from Level 2 participants who similarly upgraded and paid an additional .2 bitcoin. This is because donations went upline to the level that corresponded with the amount of the donation. The initial .1 btc payment that each participant paid was paid to and absorbed by the immediate upline participant. A level 2 (.2 btc) donation would go two levels up, a level 3 (.4 btc) donation went three levels up, and so on.

18. All Bitcoin Funding Team participants were required to pay upline donations and platform fees every month in order to stay active and to receive rewards.

19. Bitcoin Funding Team's system resulted in a continual chain of recruitment. Participants' rewards depended upon recruiting other participants to make upline payments.

20. Defendants and other participants promoted Bitcoin Funding Team to consumers nationwide through publicly available websites, YouTube videos, blogs, and recorded conference calls, touting the significant income that consumers could purportedly earn through the program. Defendants emphasized the maximum reward that could allegedly be generated through the scheme, which was 80.5 btc per month (84.2 btc of revenue less donations of 3.7 btc). Defendants frequently asserted that Bitcoin Funding Team offered a way to leverage an initial .1 btc payment into a monthly income of 84 btc.

21.  For example, in a recorded promotional call, Defendant Dluca stated:

"[W]e put a system together to just leverage $100 that can change your world and change your life . . . . Those 84 bitcoins are there."

22.  In another recorded call, Defendant Pinkston stated:

"That $100 is leveraged to get you up to a potential 84 bitcoin a month that are worth right now, today, about $1,200 a coin."

23.  Similarly, in another recorded call, Defendant Chandler asked listeners:

"How would you like to take 100 bucks and turn it into $80,000 over and over again?"

24.  In his YouTube videos, Defendant Gatto made similar claims:

"[W]e're going to show you how to turn basically a little over 100 bucks into over $80,000 in monthly residual income. How would you like to get a donation like that, folks?"

and

"We're going to receive up to 84 bitcoins in donations per month, month after month, and God willing year after year, and talk about a retirement plan."

25.  Each of the Defendants also made claims about the significant income participants were likely to achieve and the speed at which they could achieve it.

26.  For example, Defendant Dluca stated:

"We've been open for ten days. There's already people in this team that have made seven, eight, ten bitcoins, five bitcoins, because they went to work and they just shared it with their friends . . . ."

"One year, and this alone will make a millionaire of everybody on this phone if you go and ask two people to trust you and they ask two people to trust them because they pay you and the rest of this team."

and

"There's no excuse that a single one of you aren't receiving 40, 50, 80 bitcoins in a matter of 30 days. Who's holding you back? Yourself. We're not holding you back."

7

27. Defendant Pinkston stated:

"Think about what five, six, eight, ten extra bitcoin could mean to each one of these individuals on this phone tonight. Now, we're going to do that easily in the next 90 to 180 days."

and

"I can tell you this, guys, you start out by putting an extra five or six bitcoin in your pocket, or for whatever your cause may be or for whatever you want to do. The next month, it goes to eight or ten. The next month, it goes to 8, 12, 15."

28. Defendant Chandler asked:

"What if we could teach you how you can -- can grow and save and put into your own personal account maybe 100, maybe 200, maybe 500 bitcoin before the summer?"

29. Defendant Gatto asked:

"If I can show you how to turn a little over $100 bill into $5000 in the . . . next 30 days, would you listen to something for two minutes?"

30. In reality, Bitcoin Funding Team's structure, which created a continual chain of recruitment and recruitment-related payments, ensured that few participants would obtain the results depicted or projected by Defendants. In fact, once the recruitment base reached a certain level, the majority of participants at any given moment in time would have failed to recoup their initial investments.

## My7Network

31. In May and June 2017, Defendants Gatto and Pinkston began promoting My7Network. In November 2017, Defendant Dluca began promoting the program as well. Like Bitcoin Funding Team, My7Network requires participants to make a payment of bitcoin or litecoin ("ltc"), another cryptocurrency, for the right to recruit others into a downline structure. My7Network has offered a variety of bitcoin and litecoin structures over time. As promoted by Defendant Pinkston, My7Network offers four different bitcoin plans: the "My7 Mini," the "My7

8

Starter," the "My7 One," and the "My7 Three" plans. These plans require initial payments of .046 btc, .21 btc, 1.05 btc, and 3.1 btc, respectively, and each purportedly offers correspondingly higher returns. My7Network also offers a litecoin plan called "My7 Litecoin," which requires an initial payment of 3.5 ltc.

32. Like Bitcoin Funding Team, My7Network does not require participants to sell goods or services to generate revenue. Participants obtain rewards purely by recruiting new investors into the program. For example, the My7 Mini plan requires an initial payment of .046 btc and recruitment of two more participants, each of whom recruit two more participants for a second downline level of four participants; these four participants then recruit two more each for a third level of eight participants. The resulting downline consists of 14 participants. Once the 14 positions are filled and each participant makes a bitcoin payment, the primary participant "cycles" and receives a reward of .26 btc. Participants are encouraged to use this reward to buy into higher plans. The other plans work similarly; once participants make their bitcoin or litecoin payment and fill the downline structure, they receive a set reward of bitcoin or litecoin. The plans purportedly allow an unlimited number of cycles if all participants continue to make the necessary payments.

33. Like Bitcoin Funding Team, My7Network's system sets up a continual chain of recruitment. Participants can only recoup their initial investments by recruiting others into the scheme to make bitcoin payments and recruit.

34. Defendants Dluca, Gatto, and Pinkston pitch My7Network in publicly available promotional calls, YouTube videos, and social media. In these materials, they make the same type of claims concerning My7Network's income potential that they did for Bitcoin Funding Team—that the operation can provide substantial income on a monthly basis.

35.     Defendant Dluca is recorded in promotional calls making income claims about My7Network. He claims that consumers can make "a fortune" through My7Network, pay off their debts, or make a million dollars in a few months. He states there is no reason why listeners cannot be "set for life."

36.     Defendant Gatto promotes My7Network in a series of YouTube videos. In these videos, he describes the My7Network programs and claims that consumers can earn substantial income by "cycling" repeatedly. For example, he tells viewers that he will teach them how to turn one bitcoin into seven bitcoins and says, "we're going to do it over and over and over again." He displays My7Network webpages that claim that the operation is "your gateway to financial freedom" and offers "unlimited earnings" and "substantial income." He claims the system is able to generate substantial rewards within a short period of time; according to him, one participant earned seven bitcoins in one day. The implication from his promotional calls and videos is that consumers who join My7Network can similarly realize large revenues.

37.     Defendant Pinkston is recorded in promotional calls making similar claims. He describes the My7Network programs as "your true gateway to financial freedom, I will guarantee it." He also claims participants can earn unlimited income. He cites his own success as an example, claiming to have made over 30 bitcoin in less than 30 days.

38.     In reality, My7Network's chain recruiting structure ensures that most participants will lose money.

### Jetcoin

39.     In May and June 2017, Defendant Chandler promoted Jetcoin, another scheme that has already shuttered. Jetcoin, like Bitcoin Funding Team and My7Network, purported to offer consumers an opportunity to turn an initial bitcoin investment into a stream of revenue.

However, Jetcoin claimed to offer two different types of income streams—a passive investment program in which consumers would receive a guaranteed fixed rate of return on the initial bitcoin investment as a result of supposed trading by a team of experienced cryptocurrency traders, and a multilevel program in which consumers received a commission for recruiting other investors into the program.

40.     Jetcoin initially offered 8 investment packages costing from as little as .05 btc to as much as 8 btc. The more expensive packages offered higher passive returns and higher recruitment commissions. At the .05 btc level, participants acquired the right to recruit investors and receive a 10% commission on investments made by their downlines. That commission increased to as much as 25% at the higher investment levels. At the .10 btc level, participants were also promised that their investment would double in 50 days. Higher initial investments reduced the doubling period to 40 days. At some point during its operations, Jetcoin also offered a 60-day doubling period.

41.     Defendant Chandler promoted Jetcoin in a series of recorded "Master Distributor" promotional calls that were posted on YouTube in May and June 2017. He touted Jetcoin's purported earnings potential, including the guaranteed doubling of consumers' investments within 40 to 50 days. Defendant Chandler also represented that Jetcoin would pay commissions for recruiting new participants, the amounts of which depended upon the level of investment. Defendant Chandler's calls featured participants who gave testimonials about the high income they had supposedly earned and implied that consumers who joined Jetcoin could do the same.

42.     In reality, participants did not obtain the results promised by Jetcoin. Like Bitcoin Funding Team, the Jetcoin program was short-lived. After launching in May, Jetcoin announced a series of changes to its compensation plan in June and claimed it was having problems with its

software. By the end of June, Jetcoin had ceased paying promised commissions and closed its operations. It has not resumed activity. Many consumers were unable even to recover their initial investments.

## VIOLATIONS OF SECTION 5 OF THE FTC ACT

43. Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

44. Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

45. A chain referral scheme constitutes a deceptive act or practice prohibited by Section 5(a) of the FTC Act.

## COUNT I

46. As described above, Defendants promoted participation in programs that are characterized by the payment of consideration by a new recruit to other participants in the program, in return for which the recruit obtains the right to receive compensation for recruiting others into the program.

47. Through promoting its programs, Defendants have represented, directly or indirectly, expressly or by implication, that Defendants' programs are structured to operate as *bona fide* money-making opportunities.

48. In truth and in fact, Defendants' programs are not structured to operate as *bona fide* money-making opportunities, but instead operate as chain referral schemes, which by their nature, result in a substantial percentage of participants losing money.

49. Therefore, Defendants' representation as set forth in Paragraph 47 of this Complaint is false or misleading and constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT II

50. In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of the right to participate in Bitcoin Funding Team, My7Network, and Jetcoin, Defendants have represented, directly or indirectly, expressly or by implication, that consumers who participated in these programs were likely to earn substantial income.

51. In truth and in fact, in numerous instances in which Defendants have made the representations set forth in Paragraph 50 of this Complaint, consumers who participated in Bitcoin Funding Team, My7Network, or Jetcoin were not likely to earn substantial income.

52. Therefore, Defendants' representation as set forth in Paragraph 50 of this Complaint is false or misleading and constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## CONSUMER INJURY

53. Consumers have suffered and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act. In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

54. Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC. The Court, in the exercise of its equitable

jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

## PRAYER FOR RELIEF

Wherefore, Plaintiff FTC, pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b) and the Court's own equitable powers, requests that the Court:

A. Award Plaintiff such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action and to preserve the possibility of effective final relief, including but not limited to, temporary and preliminary injunctions and an order freezing assets;

B. Enter a permanent injunction to prevent future violations of the FTC Act by Defendants;

C. Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act, including but not limited to, rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies; and

D. Award Plaintiff the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

DATED this 16th day of February, 2018.

Respectfully submitted,

DAVID C. SHONKA
Acting General Counsel

_____
JASON C. MOON, Special Bar No. A5502384
SUSAN E. ARTHUR, Special Bar No. A5500887
Federal Trade Commission
1999 Bryan Street, Suite 2150
Dallas, Texas 75201
(214) 979-9378; jmoon@ftc.gov (Moon)
(214) 979-9370; sarthur@ftc.gov (Arthur)
(214) 953-3079 (Fax)
Attorneys for Plaintiff
FEDERAL TRADE COMMISSION