

Sealed

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF FLORIDA
## No. 18-cv-60379

---

**FEDERAL TRADE COMMISSION,**

    Plaintiff,

      v.

**THOMAS DLUCA, individually and also d/b/a Bitcoin Funding Team and My7Network,**

**LOUIS GATTO, individually and also d/b/a Bitcoin Funding Team and My7Network,**

**ERIC PINKSTON, individually and also d/b/a Bitcoin Funding Team and My7Network, and**

**SCOTT CHANDLER, individually and also d/b/a Bitcoin Funding Team and JetCoin,**

    Defendants.

(FILED UNDER SEAL)

---

**PLAINTIFF'S FIRST AMENDED *EX PARTE* MOTION FOR TEMPORARY RESTRAINING ORDER WITH ASSET FREEZE AND OTHER EQUITABLE RELIEF, AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE, AND MEMORANDUM IN SUPPORT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......................................................................................... iii

I.     Introduction ........................................................................................................ 1

II.     Defendants' Schemes ......................................................................................... 2
     A.    Bitcoin Funding Team .............................................................................. 2
     B.    Defendants' Roles in Bitcoin Funding Team ......................................... 3
         1.   Thomas Dluca .............................................................................. 3
         2.   Louis Gatto .................................................................................. 4
         3.   Eric Pinkston ............................................................................... 5
         4.   Scott Chandler ............................................................................. 6
     C.    Income Claims on Behalf of Bitcoin Funding Team ............................. 6
     D.    My7Network ............................................................................................ 7
     E.    Defendants' Roles in My7Network .......................................................... 9
         1.   Thomas Dluca .............................................................................. 9
         2.   Louis Gatto .................................................................................. 9
         3.   Eric Pinkston ............................................................................... 9
     F.    Income Claims On Behalf of My7Network ........................................... 10
     G.    Jetcoin's Program .................................................................................. 11
     H.    Defendant Chandler's Role in Jetcoin .................................................. 14
     I.    Income Claims on Behalf of Jetcoin ..................................................... 14

III.    Defendants' Promotion of Bitcoin Funding Team, My7Network,
        and Jetcoin Violated Section 5 of the FTC Act ................................................ 15
     A.    Bitcoin Funding Team and My7Network were chain referral schemes
         that violated Section 5 of the FTC Act ................................................. 15
     B.    Defendants violated Section 5 by promoting Bitcoin Funding Team,
         My7Network, and Jetcoin with deceptive representations ................... 16
     C.    Bitcoin Funding Team's and My7Network's Disclaimers were
         ineffective to cure the deception .......................................................... 17

IV.    The Court Should Enter a TRO to Stop Defendants' Deceptive Acts .............. 19
     A.    The Court Has the Authority to Grant the Requested Relief ................ 19
     B.    A TRO Should Be Entered Because the FTC Is Likely to Succeed
         on the Merits, and Balancing of the Equities Serves the Public Interest .. 21
     C.    Defendants Are Each Liable For Injunctive and Monetary Relief ....... 21
         1.   Thomas Dluca ............................................................................ 22
         2.   Louis Gatto ................................................................................ 23
         3.   Eric Pinkston ............................................................................. 24

| | | | |
|---|---|---|---|
| | 4. | Scott Chandler | 25 |
| D. | | An Ex Parte TRO With an Asset Freeze and Other Ancillary Relief Is Essential | 26 |
| | 1. | The TRO Should Be Entered *Ex Parte* | 26 |
| | 2. | An Asset Freeze Is Necessary | 28 |
| V. | | Conclusion | 30 |

# TABLE OF AUTHORITIES

**Cases**

*AT&T Broadband v. Tech Commc'n, Inc.*, 381 F.3d 1309 (11th Cir. 2004) .......................... 20, 28

*Bailey Emp't Sys. v. Hahn*, 545 F. Supp. 62 (D. Conn. 1982)........................................................ 17

*Beneficial Corp v. FTC*, 542 F. 2d 611 (3rd. Cir. 1976)................................................................ 19

*CFTC v. British Am. Commodity Options Corp.*, 560 F.2d 135 (2d Cir. 1977) .......................... 21

*CFTC v. Hunt*, 591 F.2d 1211 (7th Cir. 1979)............................................................................... 21

*FTC v. 1st Guar. Mortg. Corp.*, No. 09-CV-61840, 2011 WL 1233207 (S.D. Fla. Mar. 30, 2011)
........................................................................................................................................................... 22

*FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564 (7th Cir. 1989)....................................................... 22

*FTC v. Equinox Int'l*, No. CV-S-990969HBR(RLH), 1999 WL 1425373 (D. Nev. Sept. 14,
1999) ................................................................................................................................................ 18

*FTC v. Five-Star Auto Club*, 97 F. Supp. 2d 502 (S.D.N.Y. 2000).............................................. 17

*FTC v. Fortune Hi-Tech Mktg., Inc.*, No. 13-CV-578 (N.D. Ill. Jan. 24, 2013).......................... 28

*FTC v. FTN Promo., Inc.*, No. 8:07-CV-1279, 2008 WL 821937 (M.D. Fla. Mar. 26, 2008)..... 22

*FTC v. Gem Merch. Corp.*, 87 F.3d 466 (11th Cir. 1996) .................................................. 20, 22, 29

*FTC v. IAB Mktg. Assocs., LP*, 746 F.3d 1228 (11th Cir. 2014) ........................................... 20, 29

*FTC v. Jordan Ashley*, No. 93-2257-CIV, 1994 WL 200775 (S.D. Fla. April 5, 1994) .............. 22

*FTC v. Medicor, LLC*, 217 F. Supp. 2d 1048 (C.D. Cal. 2002) .................................................... 18

*FTC v. Minuteman Press*, 53 F. Supp. 2d 248 (E.D.N.Y. 1998)................................................... 17

*FTC v. Para-Link, Int'l, Inc.*, No. 8:00-CV-2114-T-17TBM, 2001 U.S. Dist. LEXIS 17372
(M.D. Fla. Feb. 28, 2001) ........................................................................................................ 20, 21

*FTC v. Peoples Credit First, LLC*, 244 Fed. App'x. 942, 944 (11th Cir. 2007)........................... 16

*FTC v. Singer, Inc.*, 668 F.2d 1107 (9th Cir. 1982)...................................................................... 20

*FTC v. SkyBiz Int'l, Ltd.*, 4:01-CV-00396-CVE-FHM (N.D. Okla. June 6, 2001) ..................... 28

*FTC v. SlimAmerica, Inc.*, 77 F. Supp. 2d 1263 (S.D. Fla. 1999) ................................................ 16

*FTC v. Tashman*, 318 F.3d 1273 (11th Cir. 2003)......................................................................... 16

*FTC v. Transnet Wireless Corp.*, 506 F. Supp. 2d 1247 (S.D. Fla. 2007).................................... 16

*FTC v. Trek Alliance Inc.*, No. CV-02-9270 DSF (AJWx) (C.D. Cal. Dec. 16, 2002) ................ 28

*FTC v. U.S. Oil & Gas Corp.*, 748 F.2d 1431 (11th Cir. 1984)..................................................... 20

*FTC v. University Health, Inc.*, 938 F.2d 1206 (11th Cir. 1991)................................................... 20

*FTC v. USA Beverages, Inc.*, 2005 U.S. Dist. LEXIS 39075 (S.D. Fla. 2005) ............................ 21

*FTC v. USA Fin., LLC*, 415 F. App'x 970 (11th Cir. 2011) ................................................ 20, 21, 22

*FTC v. Vemma Nutrition Co.*, 2015 WL 11118111 (D. Ariz. Sept. 18, 2015) ............................. 19

*FTC v. Washington Data Resources*, 856 F. Supp. 2d 1247 (M.D. Fla. 2012) ............................ 19

*FTC v. Wolf*, No. 94-8119-CIV, 1996 WL 812940 (S.D. Fla. Jan. 31, 1996) ............................. 17

*FTC v. World Travel Vacation Brokers*, 861 F.2d 1020 (7th Cir. 1988).............................. 20, 29

*FTC v. World Wide Factors*, 882 F.2d 344 (9th Cir. 1989)........................................................... 21

*FTC v.Gill*, 71 F. Supp. 2d 1030 (C.D. Cal. 1999)....................................................................... 18

*Ger-Ro-Mar, Inc.*, 84 F.T.C. 95 (1974), *rev'd in part on other grounds*, 518 F.2d 33 (2d Cir.
1975) ............................................................................................................................................... 15

*In re Holiday Magic, Inc.*, 84 F.T.C. 748 (1974)........................................................................... 16

*In re Nat'l Credit Mgmt. Grp.*, 21 F. Supp. 2d 424 (D.N.J. 1998) .............................................. 29

*Koscot Interplanetary, Inc.*, 86 F.T.C. 1106 (1975) ..................................................................... 15

*Nat'l Dynamics Corp. v. FTC*, 492 F.2d 1333 (2d Cir. 1974)...................................................... 17

*nited States v. Diapulse Corp. of America*, 457 F.2d 25 (2d Cir. 1972)...................................... 21

*Porter v. Warner Holding Co.*, 328 U.S. 395 (1946)....................................................... 20

*Removatron Int'l Corp. v* FTC, 884 F.2d 1489 (1st Cir. 1989) ................................. 18, 19

*SEC v. ETS Payphones, Inc.*, 408 F.3d 727 (11th Cir. 2005) ........................................ 29

*SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082 (2d Cir. 1972)................................... 29

*SEC v. R.T. Allen & Assocs.*, 386 F. Supp. 866 (S.D. Fla. 1974) ................................. 21

*U.S. Oil & Gas Corp.*, 1987 U.S. Dist. LEXIS 16137 (S.D. Fl. 1987) ......................... 17

*United States v. Gold*, 177 F. 3d 472, 480-481 (6th Cir. 1999)...................................... 29

*United States v. Grasso*, 173 F. Supp. 2d 353 (E.D. Pa. 2001) .................................... 29

*United States v. Odessa Union Warehouse Co-op*, 833 F.2d 172 (9th Cir. 1987) ......... 20

*Waffenschmidt v. Mackay*, 763 F.2d 711 (5th Cir. 1985) .............................................. 30

## Statutes

15 U.S.C. § 45(a) ...................................................................................................... 1, 16, 17

15 U.S.C. § 53(b) ....................................................................................................... 20, 22

Ariz. Rev. Stat. Ann. § 44-1735.................................................................................... 29

Fla. Sta. Ann. § 849.091 .............................................................................................. 29

## I.    Introduction

The Federal Trade Commission ("FTC") requests that this Court put an immediate end to Defendants Thomas Dluca, Louis Gatto, Eric Pinkston, and Scott Chandler's promotion of deceptive cryptocurrency investment schemes. Since at least early 2017, Defendants have enticed consumers to invest cryptocurrency—specifically bitcoin or litecoin—in three schemes: Bitcoin Funding Team, My7Network, and Jetcoin. Defendants have claimed that consumers could make substantial or even life-changing income through the programs. In reality, the programs were scams designed to enrich a few early participants and victimize the rest. Bitcoin Funding Team and My7Network were illegal chain referral schemes. These programs required participants to make an initial bitcoin or litecoin payment which they could recoup only by recruiting others to join and make payments in turn. The result was a continual chain of recruitment that ensured that the majority of participants would lose money.[1] The third scheme, Jetcoin, guaranteed consumers a doubling of their bitcoin investments based on the supposed activities of a team of anonymous cryptocurrency traders. Jetcoin shuttered after only a month of operations, resulting in heavy losses by investors.

Collectively, these schemes have purportedly recruited at least 30,000 participants in the U.S and other countries, according to claims by promoters.[2] Defendants' promotion of these schemes violated Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45(a), which prohibits deceptive acts or practices in or affecting commerce. To stop Defendants' illegal conduct, preserve their business records, and preserve assets for consumer restitution, the FTC moves the Court to enter an *ex parte* temporary restraining order with an asset freeze and other ancillary relief. A proposed TRO has been submitted with this Motion.

---

[1] The related term "pyramid scheme" has been used to describe recruiting chains in which the enrollment fee takes the form of a purchase of goods or services and the recruitment reward takes the form of commissions on purchases by recruits.

[2] *See* App. 113.28 (screenshot from video showing that the Bitcoin Funding Team platform had 13,274 members as of May 17, 2017); App. 201:10-12, 597; (Dluca claims Bitcoin Funding Team had participants in 71 countries); 410:15-19, 618 (Pinkston claims My7Network had 1,110 to 1,150 members six weeks after launch; 535:15-536:3, 634 (Pinkston claims My7Network had spread to more than 50 countries); 493:17-21, 629 (Chandler claims almost 20,000 people had signed up with Jetcoin); 459:3-4, 625 (Jetcoin promoter claims Jetcoin had enrolled people in over a hundred countries).

## II.    Defendants' Schemes

### A.    Bitcoin Funding Team

Bitcoin Funding Team was an Internet operation that started in February 2017[3] and had announced closure by August 2017. Although the operation described itself as a platform (rather than a company)[4] through which participants could use mutual donations to fund "family or friends in need," "organizations or groups," or "global or local causes,"[5] Defendant Dluca, who identified himself as a creator of the program, asserted that "causes" could include things like education, medical expenses,[6] paying off houses, retirement,[7] or accumulating personal wealth.[8] He and the other Defendants claimed the program would generate substantial income for participants on a monthly basis.

Bitcoin Funding Team offered no products or services.[9] Participants enrolled by paying a .008 bitcoin ("btc") platform fee and making an initial payment ("donation") of 0.1 btc, which was routed to a previously enrolled participant.[10] This initial payment granted participants the right to recruit others into the network and to receive recruitment rewards. Each participant recruited two participants, who in turn recruited two more, and so on down to five levels of recruitment. The resulting pyramid-shaped downline (also called a 2x5 matrix) included 2, 4, 8, 16, and 32 participants in Levels 1, 2, 3, 4, and 5, respectively, for a total of 62 participants. The initial .1 btc payment entitled the participant to receive payments from Level 1 recruits; participants had to make additional, larger payments ("upgrades") to receive payments from

---

[3] App. 200:21-22, 597 (in February video, Dluca stated that the program was 10 days old).

[4] App. 113.26; 297:4-5, 601.

[5] App. 113.25.

[6] App. 148:20-149:1, 593.

[7] App. 155:4-10, 593.

[8] App. 204:21 to 25, 597 ("One year, and this alone will make a millionaire of everybody on this phone if you go and ask two people to trust you and they ask two people to trust them because they pay you and the rest of this team.").

[9] App. 113.26; 296:5-7, 601.

[10] See generally App. 603, at timestamp 25:25 to 36:15.

levels 2 through 5. Participants were required to renew their payments every month in order to retain their position in the matrix.[11] Promoters claimed that a full matrix would generate over 84 btc per month.[12]

Bitcoin Funding Team was presented as a bona fide income opportunity, but in fact it was a chain referral scheme prohibited by the FTC Act because it required participants to make an initial investment, in exchange for which the participant acquired the right to recruit others and obtain payments from recruits.[13] Since the operation offered no products or services, the only way a participant could recoup his or her initial investment was to recruit new participants into the multi-level structure.[14] Dr. William Keep, a professor of marketing retained as an expert by the FTC to examine the program, agrees. He concluded that Bitcoin Funding Team was a chain referral scheme and resembled past schemes known as "gifting clubs," endless chains," or "investment pyramid schemes."[15] He also determined that the majority of participants in Bitcoin Funding team would have lost money. In fact, at any particular point in time, the bottom three levels of the Bitcoin Funding Team recruitment network would be in a loss position; this equates to approximately 87.6% of participants.[16]

### B.    Defendants' Roles in Bitcoin Funding Team

#### 1.    Thomas Dluca

Defendant Dluca was described by other participants as the founder, owner, creator, and administrator of Bitcoin Funding Team.[17] He participated in recorded conference calls that were

---

[11] This preceding description of the program comes from Dr. William Keep's analysis and from promotional videos. *See* Declaration of William W. Keep, PhD ("Keep Declaration"), at ¶¶ 7-10 (App. 116-118) and App. 296:9-296.3:19, 601.

[12] *See* App. 113.27; *see also* Keep Declaration, at ¶ 9 and Table 1 (App. 116, 117). One bitcoin was worth approximately $1,000 at the time the scheme was launched; the estimated price as of February 9, 2018 was $8,445.00. *Id.* at fn 3 (App. 116).

[13] *Id.* at ¶ 11 (App. 118).

[14] *Id.*

[15] *Id.* at ¶ 26 (App. 125).

[16] *Id.* at ¶¶ 20-21 (App. 122-123).

[17] *See, e.g.*, App. 113.20; 174:19-175:7, 176:12-23, 183:9-185:7, 600; 199:23-25, 597; 309:23-

subsequently posted on the Internet, in which he described and promoted the program.[18] Throughout the calls, he identified himself as a creator of the program[19] and claimed administrative control over the platform.[20] He made deceptive income claims on behalf of the program.

### 2. Louis Gatto

Defendant Gatto promoted the program with an extensive line of YouTube videos.[21] In these videos, Defendant Gatto trained participants in the operation of Bitcoin Funding Team's matrix and website by using screenshots of his own "member dashboard" and proceeding step by step through the initial payment,[22] recruitment of additional participants, and payment upgrades.[23] Viewers who watched Defendant Gatto's videos in chronological order could observe him filling his matrix and ascending levels within the structure.[24] Defendant Gatto also promoted Bitcoin Funding Team on Facebook.[25] He used deceptive income claims to promote the program.

---

310:1, 599; 268:24-269:5, 592; 331:17-332:8, 602.

[18] *See generally* App. 593; 200:2-206:21, 597; 243:4-247:8, 596; 256:12-262:15, 598; 269:10-278:10, 592; 332:9-340:6, 602.

[19] *See, e.g.,* App. 149:5-13, 593; 200:2-5, 597; 243:4-7, 596; 270:8-10, 592; 333:19-334:3, 602.

[20] *See, e.g.* App. 150:8-154:10, 593 (discussing upcoming overhaul of platform, including adding "compression" to flush out inactive participants); 203:19-20:1, 597 (discussing upcoming changes to software); 204:17-20, 597 (discussing operation's "leadership council"); 243:4-244:15, 596 (discussing ongoing projects to address technological issues); 339:18-22, 602 ("We're managers and we'll manage this with integrity"); 336:14-15, 602 ("Yeah, we handle the platform.").

[21] *See generally* App. 594; 606; 608; 609; 610; 611; 612.

[22] *See generally* App. 606.

[23] *See generally* App. 609, at timestamp 4:57 through 7:52; App. 608, at timestamp 21:15 to 29:24.

[24] *Cf* App. 113.22 *with* App. 113.23 *and* App. 113.29.

[25] *See* App. 113.6-113.11.

### 3.   Eric Pinkston

Defendant Pinkston was one of the earliest participants in the scheme. Defendant Dluca stated in one recorded conference call that Defendant Pinkston was one of two initial enrollees.[26] Other participant referred to him as being "at the very top of this program"[27] and as one of the original creators.[28] He promoted Bitcoin Funding Team in several recorded videoconferences.[29] He offered to help participants with problems with the platform[30] even if the participants were not on his "team" (downline).[31] He claimed to work closely with Defendant Dluca on perfecting the system.[32] He used deceptive income claims to promote the program.

### 4.   Scott Chandler

Defendant Chandler promoted Bitcoin Funding Team in recorded conference calls.[33] In at least two calls, Defendant Chandler described Bitcoin Funding Team's matrix in detail and trained participants on how to maximize results.[34] He claimed to speak with Dluca every day.[35]

---

[26] App. 339: 7-12, 602 ("Right now, we figured a way to help our friends. [. . .]I invited two friends, Eric and Sam, and it all began there from me inviting two friends.").

[27] App. 267:17-24, 592.

[28] App. 308:11-17, 599. It is unknown whether Defendant Pinkston in fact worked with Defendant Dluca to create the program, but he was clearly viewed as being very high in the program.

[29] *See generally* App. 177:13-179:9, 180:24-188:16, 600; 221:9 -227:2, 228:21-232:23, 233:21-240:6, 241:19-243:3, 596; 252:5-256:11, 598; 325:21-332:8, 602; 379:6-382:9, 383:20-384:14, 385:19-386:8, 613.

[30] App. 223:8-21, 225:7-12, 596.

[31] App. 226:11-16, 596.

[32] *See* App. 183:9-185:7, 600 (describing repeated contacts with Defendant Dluca to address issues with the platform)

[33] *See generally* App. 193:22-198.1:19, 597; 284:19 -291:14, 595; 315:23-318:3, 340:7-345:24, 602.

[34] *See* App. 341:10-345:1, 602; 284:19-289:8, 595.

[35] App. 198:18-24, 597.

He used deceptive income claims to promote the program.

### C.   Income Claims on Behalf of Bitcoin Funding Team

Bitcoin Funding Team promoters claimed that the program could generate 84 btc per month, and Defendants often invoked this optimal scenario, stating that Bitcoin Funding Team's matrix was a way to leverage a one-time, 0.1 btc donation into a potential 84 btc or equivalent cash amounts every month.[36] Defendants Gatto and Chandler also illustrated the operation of the matrix up to the 84 btc level in their promotional material.[37]

In addition to describing the optimal scenario, Defendants claimed participants could make large amounts of money within a short period of time:

Dluca:      One year, and this alone will make a millionaire of everybody on this phone if you go and ask two people to trust you and they ask two people to trust them because they pay you and the rest of this team.[38]

There's no excuse that a single one of you aren't receiving 40, 50, 80 bitcoins in a matter of 30 days.  Who's holding you back?  Yourself. We're not holding you back.[39]

Gatto:      If I can show you how to turn a little over $100 bill into $5000 in the [ . . .] next 30 days, would you listen to something for two minutes?[40]

Pinkston:   Think about what five, six, eight, ten extra bitcoin could mean to each one of these individuals on this phone tonight.  Now, we're going to do that easily in the next 90 to 180 days.
                             *        *        *
I can tell you this, guys, you start out by putting an extra five or six bitcoin in your pocket, or for whatever your cause may be or for whatever you

---

[36] *See, e.g.*, App. 204:25-205:3, 597 (Dluca); 335:17-336:3, 338:1-10, 602 (Dluca); 160:21-161:6, 594 (Gatto); 360:14-363:8, 610 (Gatto); 380:14-381:4, 613 (Pinkston); 194:7-10, 597 (Chandler).

[37] *See* App. 164:3-169:4, 594 (Gatto); 350:10 to 354:4, 612 (Gatto); 287:5-288:24, 595 (Chandler).

[38] App. 204:21-25, 597.

[39] App. 261:2-5, 598.

[40] App. 213:16-213.1:1, 609.  Gatto also tells prospects they can make $14,000 within a month. App. 362:16-18, 610.

want to do.  The next month, it goes to eight or ten.  The next month, it goes to 8, 12, 15.[41]

Chandler:      What if we could teach you how you can - - can grow and save and put into your own personal account maybe 100, maybe 200, maybe 500 bitcoin before the summer is over?[42]

Defendants also made other types of income claims.[43]

Defendants' claims were deceptive.  Bitcoin Funding Team's structure ensured that few participants achieved the results claimed by Defendants, and, in fact, most participants would have lost money.

**D.    My7Network**

In May 2017, Defendants Gatto and Pinkston began to appear in videos promoting a new cryptocurrency scheme, My7Network.[44] Defendant Dluca began to appear in videos promoting the scheme in November 2017.[45] My7Network describes itself as an "easy-to-follow business system" that provides "your gateway to financial freedom" and a "substantial income while you build a business from the comfort of your own home."[46] Defendants Dluca, Gatto and Pinkston claimed the program could provide substantial or even unlimited income. However, My7Network, like Bitcoin Funding Team, is a chain referral scheme that depends purely upon the recruitment of others to generate income, ensuring that most participants lose money.

My7Network has promoted multiple plans that have changed over time, but have recently included the "My7World," "My7Mini," "My7Starter," "My7One," and "My7Rocket" bitcoin plans and the "My7Future," "My7Litecoin," "My7Lightning," and "My7Freedom plans

---

[41] App. 185:14-18, 187:2-7, 600; *see also* App. 328:21-329:4, 602 (Pinkston claims participants can learn to leverage .1 btc into two, five, ten, or 20 bitcoins within next 90 days).

[42] App. 197:10-13, 597.

[43] *See* Declaration of Brent McPeek ("McPeek Declaration"), at ¶¶ *11-13 (App. 106-109).

[44] *See* App. 113.54-113.55; 113.38-113.39.

[45] *See* App. 113.56-113.58.

[46] App. 113.1; 113.2.

involving litecoin, another cryptocurrency.[47] These plans require initial payments ranging from .77 litecoin ("ltc") to 1.05btc.[48] In order to receive cryptocurrency rewards, participants must "cycle" the plans by filling a recruitment matrix.  For example, the "My7Litecoin" scheme requires the participant to makes an initial payment of 3.5 ltc and to recruit others into a 2x2 matrix. The 2x2 designation refers to the binary structure and two-level downline. The participant fills the matrix by recruiting two more participants, each of whom recruit two more participants for a second level of four participants. The resulting pyramid-shaped downline consists of six participants.[49] After filling the matrix, the participant receives a set reward of 8.5 ltc.[50]

Other plans promoted by My 7 Network are 2X3 matrices.[51] Participants can cycle the same plan repeatedly, but promoters encourage them to use the rewards from lower-level plans to invest in higher-level plans.[52]

Like Bitcoin Funding Team, My7Network appears not to offer any products or services for sale.[53] Participants obtain rewards by recruiting new investors into the program. The FTC's expert analyst, Dr. Keep, determined that My7Network, like Bitcoin Funding Team, is a chain

---

[47] This paragraph describes the program as it was promoted in recent videos reviewed by Dr. Keep.  *See* Keep Declaration, at Table 3 (App. 128).  A February 2018 recapture of my7network.com shows that the scheme is now offering a different selection of matrices, including new matrices for Bitcoin Cash and Ethereum, which are also cryptocurrencies.  *See* App. 113.3-113.5.

[48] Keep Declaration, at Table Three (App. 128).

[49] *Id.* at ¶ 28 (App. 126).

[50]  *Id.* For a description of the My7Mini program, *see* App. 397:19-398:17, 614; 113.31.

[51] *See* App. 113.30; 113.32; 113.3; 113.4; 113.5.  *See also* Keep Declaration, at Table Three (App. 128).

[52] *See, e.g.,* 399:19-400:13, 615.  *See also* Keep Declaration, at ¶¶ 29-30 (App. 126-127).

[53]   In a September 19, 2017 video (approximately 5 months after launch), a participant claimed that a suite of business training materials would soon be available.  App. 553:4-13, 635.  However, it is unclear to what extent this content was implemented; a February 2017 re-capture of my7network.com contained no reference to this material.  *See generally* App. 642.  Defendant Dluca offered general cryptocurrency investment advice in his videos (*see, e.g.,* 584:16-586:3, 639), but there is no evidence that My7Network has ever sold trading advice or services.

referral scheme.[54]  He has also concluded that the structure of the program means that the overwhelming majority of participants will be in a loss position at any given point in time during the life of the program.[55]

     **E.**       **Defendants' Roles in My7Network.**

         **1.**       **Thomas Dluca**

Defendant Dluca promoted My7Network in a series of conference calls that were posted on YouTube.[56] In those calls, he described the various plans, made deceptive income claims, and encouraged listeners to spread the program by recruiting just two others.[57]

         **2.**       **Louis Gatto**

Defendant Gatto promoted My7Network on YouTube and social media.[58] He produced a series of YouTube videos in which he explained the program in detail and made deceptive income claims on behalf of the program.[59]

         **3.**       **Eric Pinkston**

Defendant Pinkston promoted My7Network in a series of recorded videoconferences.[60] In these videos, he made deceptive income claims on behalf of the program and also implied to listeners that he had insider knowledge about the program and some level of administrative input.[61] In one call, he announced upcoming changes to the program that were "not quite ready for release," including the addition of marketing tools and a new matrix.[62] In the same call, he

---

[54] Keep Declaration, at ¶ 33 (App. 128-129).

[55] *Id.* at ¶ 36 (App. 129-130).

[56] *See generally* App. 638-641.

[57] *See* discussion at Sections II.F and IV.C.1, *infra.*

[58] *See generally* App. 631-633 (videos); 113.12-113.17 (Facebook posts).

[59] *See* discussion at Sections II.F and IV.C.2, *infra.*

[60] *See generally* App. 614; 618; 630; 634; 636; 637.

[61] *See* discussion in Sections II.F and IV.C.3, *infra.*

[62] App. 422:2 to 428:21, 618.

implied that he handled "support tickets" on behalf of the program.[63]

### F.        Income Claims On Behalf of My7Network.

Defendant Dluca made multiple claims in his videos to the effect that viewers could achieve financial freedom through the My7Network program. He warned that viewers who did not join would miss the "biggest wealth creation" they had ever seen[64] and that there was "a fortune to be made here."[65] He claimed that listeners could "wipe out your debt like it is nothing" with the program[66] and that there was no reason why listeners should not be "set for life" by "playing with this system."[67] He also stated that listeners could make a million dollars in a few months through the program if they were willing to "buckle down and go to work."[68] He also described specific amounts—including as much as $54,600—viewers could make by cycling the matrices.[69]

Defendant Gatto described the My7Network programs in his YouTube videos and claimed deceptively that consumers could earn substantial income by cycling repeatedly. For example, he told consumers that he would teach them how to turn one bitcoin into seven bitcoins and said, "we're going to do it over and over and over again."[70] He displayed My7Network webpages that claim the operation is "your gateway to financial freedom" and offers "substantial income."[71] He claimed the system is able to generate substantial rewards within a short period of time; he gave examples of participants who

---

[63] App. 426:20-24, 618 (Pinkston states that he had only "seven or eight support tickets" come directly to him).

[64] App. 573:2-6, 638.

[65] App. 574: 12-13, 638.

[66] App. 575:19-20, 638.

[67] App. 588:1-5, 639.

[68] App. 578:25-579:2, 638.

[69] App. 577:6-9, 638.

[70] App. 516:11-13, 632; *see also* App. 502.1:6-7, 631.

[71] App. 113.37.

had supposedly filled one of the matrices in one day, a week, or thirteen days.[72] The
implication from his promotional videos is that consumers who join My7Network can
realize large revenues.

Defendant Pinkston made similar claims in recorded promotional calls. He described the
My7Network programs as "the true gateway to financial freedom . . . . I will guarantee it."[73] He
also claimed participants could earn unlimited income.[74] He cited his own purported success as
an example, claiming to have made over 30 btc in less than 30 days[75] and, with another
participant, "Jim," 44 to 46 btc in six weeks.[76] He also made a variety of other income claims.[77]

### G.    Jetcoin's Program

In May and June 2017, Defendant Chandler promoted Jetcoin, another deceptive bitcoin
scheme, in a series of recorded "Master Distributor" promotional calls that were posted on
YouTube.[78] Jetcoin was launched on or around May 31, 2017.[79] Like Bitcoin Funding Team and
My7Network, Jetcoin offered consumers the purported opportunity to turn an initial bitcoin
investment into a stream of revenue. However, Jetcoin claimed to offer two different types of
income streams—a passive investment program in which consumers were guaranteed to double
their initial bitcoin investment within a specific period of time, and a multilevel program in
which consumers received a commission for recruiting other investors.[80]

---

[72] App. 511:21-23, 631 (one day and 13 days); App. 525:1-2, 632 (one day); App. 530:19-24, 633 (one day and one week).

[73] App. 396:9-11, 614. *See also* App. 113.33 (showing website screenshot claiming that program is "your gateway to financial freedom" and offers "substantial income").

[74] App. 396:14-15, 397:10-12, 614; 409:4-5, 409:13-14, 618.

[75] App. 396:24-397:2, 614; 431:11-13, 620. App. 614 and App. 620 appear to be two different edits of the same video, posted on YouTube at separate times.

[76] App. 421.1:22-24, 618.

[77] *See* McPeek Declaration, at ¶ 14 (App. 109-110).

[78] *See generally* App. 624; 625; 626; 628; 629.

[79] *See* App. 461:7-8, 471:16-21, 626; 440:7-8, 443:13-17, 624.

[80] App. 113.34.

Promoters claimed that Jetcoin was able to offer a guaranteed doubling of the initial investment because of the activities of an experienced team of cryptocurrency traders.[81] In a recorded conference call, Defendant Chandler stated that the people "behind the scenes" wished to remain anonymous so people would not be calling them all the time or even harm their families.[82] In other calls, Defendant Chandler assured listeners that he knew the people "behind the scenes" and trusted them.[83] He used the analogy of a small child who is not worried about a train crash because his daddy is driving the train, and told listeners "We know the guy who's making things happen with Jetcoin."[84]

The Jetcoin train began to go off the rails shortly after it left the station. On a June 14, 2017 call, Defendant Chandler informed listeners that Jetcoin was making changes to preserve the longevity of the company, including extending the time period in which participants would double their bitcoin from a 40 to 50 day range to 60 days, and reducing the maximum investment.[85] However, he continued to promote the program.[86] In a June 21, 2017 call, Chandler announced that Jetcoin had been hacked and had made some erroneous payments, that the website was down for maintenance, and that commissions would be stopped until the website was reprogrammed.[87] He also announced another reduction in the passive investment payouts.[88]

---

[81] *See, e.g.* App. 436:6-13, 437:23-438:2, 623 (promoter claims Jetcoin has a team of experienced traders in Japan); 476:19-23, 628 (Chandler states company can pay 4 to 5 percent per day because of cryptocurrency trading); 482:24-483:4, 628 (promoter assures listeners that "the traders are making so much money in the background that it's not even funny").

[82] App. 465:13-466:2, 626.

[83] App. 445:4-6, 624 ("[W]e know the people behind the scenes, and everything is working flawlessly."); 479:4-6, 628 ("we trust the people that we know behind the scenes").

[84] App. 486:3-487:6, 628.

[85] App. 477:15-478:9, 484:3-6, 485:6-14, 628.

[86] App. 488: 14-19, 628.

[87] App. 494:17-495:22, 498:8-11, 629.

[88] App. 495:22-497:25, 629.

Jetcoin stopped making payouts around this time and never resumed.[89] Soon after, Defendant Chandler acknowledged that there was no cryptocurrency trading behind the program, and that he was resigning.[90] On August 29, 2017, Jetcoin's website announced that the operation had new owners and would be operating under the name "My Digital BTC."[91] However, in September 2017, MyDigital BTC announced that it was also shutting down.[92] Consumers who invested in Jetcoin were unable to recover their initial investments.[93]

As noted above, Jetcoin's false earnings promises changed several times. As described by a promoter in a June 9, 2017 YouTube video, Jetcoin initially offered eight supposed investment packages costing between .05 btc and 8 btc.[94] The more expensive packages claimed to offer higher passive returns and higher recruitment commissions.[95] At the .05 btc level, participants acquired the right to recruit investors and to receive a 9 percent commission on investments made by their downlines.[96] That commission increased to as much as 25 percent at higher investment levels.[97] At the .10 btc level, participants were promised that their investment would double in 50 days.[98] Higher investments were supposed to reduce the doubling period to 40 days.[99] However, all of these claims were prove false for investors who paid into the scheme and

---

[89] Declaration of Kai Shen Phan ("Phan Declaration"), at ¶ 5 (App. 140); Declaration of Raymos Gonzales ("Gonzales Declaration"), at ¶ 4 (App. 143-144).

[90] Phan Declaration, at ¶ 5 (App. 140).

[91] *Id.*, at ¶ 7 (App. 140).

[92] *Id.*; App. 141-142.

[93] *Id*, at ¶ 8 (App. 140); Gonzales Declaration, at ¶ 5 (App. 144).

[94] App. 113.35 (screenshot from YouTube video); 113.36 (screenshot from YouTube video).

[95] App. 113.34; 113.35; 113.36.

[96] App. 113.35.

[97] App. 113.36.

[98] App. 113.35.

[99] App. 113.36.

were unable to even recover their initial investments.

### H.      Defendant Chandler's Role in Jetcoin

Defendant Chandler was described by another participant as a master distributor of Jetcoin.[100]  His promotional calls, as posted on YouTube, were titled "Jetcoin Master Distributor" calls.[101]  He was likely at the very top of the organization; when Jetcoin began to reduce its payouts, he told listeners he was unable to return all phone calls because he was getting a thousand calls a day and had over 15,000 members on his team.[102] Though characterized as a distributor, he boasted insider status by claiming to know the people behind the scenes, and leveraged that status to try to calm investors once Jetcoin began to repudiate its promises.[103]

Defendant Chandler also claimed to have had input in the development of the program. In the May 31, 2017 call, which occurred just as the program was launching, he stated that he had been able to go behind the scenes for "the last two or three months" and make some suggestions.[104] In a later call, he claimed that he and his partner "pushed Jetcoin just a little bit" by pressing a guy they knew and people "behind the scenes" to make the program better than other programs, possibly by increasing the payouts.[105]

### I.      Income Claims on Behalf of Jetcoin

Defendant Chandler promoted Jetcoin aggressively with deceptive income claims. In addition to describing the promised investment returns,[106] Defendant Chandler implied that he could teach listeners how to make 100 bitcoin by the end of the year.[107] His calls also featured

---

[100] App. 436:24-437:11, 623.

[101] App. 113.40-113.41; 113.42-113.43; 113.44-113.45; 113.46-113.49; 113.50-113.53.

[102] App. 480:12-481:4, 628.

[103] *See* discussion at Section II.G, *supra*.

[104] App. 469:24-470:2, 626.

[105] App. 476:13-21, 628.

[106] *See, e.g.,* App. 445:24-447:3, 624; 467:5 to 468:23, 626.

[107] *See* App. 458:17-24, 625.

participants who gave testimonials about the high incomes they had supposedly earned through Jetcoin and implied that consumers who joined Jetcoin could do the same.[108]

### III.   Defendants' Promotion of Bitcoin Funding Team, My7Network, and Jetcoin Violated Section 5 of the FTC Act

#### A.   Bitcoin Funding Team and My7Network were chain referral schemes that violated Section 5 of the FTC Act

It has long been recognized that chain referral schemes are deceptive and violate Section 5 of the FTC Act.[109] Chain referral schemes—which sometimes take the form of chain letters or gifting clubs—rely upon fees from newly recruited participants to fund the rewards paid to earlier, upline participants. As a result, each new participant remains in a loss position until he or she has recruited and extracted fees from additional levels of downline participants. The schemes necessarily require a continual chain of recruitment. The promise of rewards is untrue for the vast majority of participants who, due to the geometric progression of the scheme, are comprised mostly of new recruits who have not received rewards from downline participants.

It is this central characteristics of chain referral schemes—payment for the right to receive compensation for recruiting others into the program—that form the underpinning of the FTC Act's prohibition of such schemes. *See In re Holiday Magic, Inc.*, 84 F.T.C. 748, 1037 (1974) ("A plan which holds out the opportunity of making money, by means of recruiting others, with that right to recruit being passed on as an inducement for those others to join, and being passable by them *ad infinitum*, contains an intolerable potential to deceive, quite apart from whatever particular representations may be made in promoting the plan.").

Both Bitcoin Funding Team and My7Network are programs in which the participant pays consideration to other participants, in return for which the recruit obtains the right to receive

---

[108] *See* McPeek Declaration, at ¶ 15 (App. 110-111).

[109] *See Koscot Interplanetary, Inc.*, 86 F.T.C. 1106, 1181 (1975) (recruiting chains and similar schemes involve "the inevitably deceptive representation (conveyed by their mere existence) that any individual can recoup his or her investment by means of inducing others to invest"); *Ger-Ro-Mar, Inc.*, 84 F.T.C. 95, 147 (1974) (noting that courts and legislatures "have recognized since time immemorial" that "the chain letter and similar devices . . . constitute a threat to the public welfare"), *rev'd in part on other grounds*, 518 F.2d 33 (2d Cir. 1975).

compensation for recruiting others into the program. Accordingly, each is an unlawful chain referral scheme in violation of Section 5 of the FTC Act.

**B.      Defendants violated Section 5 by promoting Bitcoin Funding Team, My7Network, and Jetcoin with deceptive representations**

An act or practice is deceptive under Section 5 of the FTC Act if it involves a material representation or omission that would likely mislead consumers acting reasonably under the circumstances.[110] Express claims, or deliberately made implied claims, used to induce payments for products or services are presumed to be material.[111]  As shown above, each of the Defendants have expressly and impliedly represented to consumers that Bitcoin Funding Team or My7Network were bona fide money-making opportunities.  In doing so, they were deceiving consumers and violating Section 5. Chain referral schemes are not bona fide money-making opportunities because they necessarily result in the majority of participants losing money.

Defendants have also violated Section 5 by using deceptive income claims to promote Bitcoin Funding Team, My7Network, and Jetcoin. The law is clear that misrepresentations regarding profit potential are material and violate Section 5(a) of the FTC Act.[112] An entity may not "make deceptive use of unusual earnings realized only by a few."[113]

---

[110] *FTC v. Tashman*, 318 F.3d 1273, 1277 (11th Cir. 2003); *FTC v. Peoples Credit First, LLC*, 244 Fed. App'x. 942, 944 (11th Cir. 2007) (following *Tashman*).

[111] *FTC v. Transnet Wireless Corp.*, 506 F. Supp. 2d 1247, 1267 (S.D. Fla. 2007); *FTC v. SlimAmerica, Inc.*, 77 F. Supp. 2d 1263, 1272 (S.D. Fla. 1999).

[112] *See FTC v. Five-Star Auto Club*, 97 F. Supp. 2d 502, 529 (S.D.N.Y. 2000) ("representations regarding the profit potential of a business opportunity are important to consumers, and therefore such are material misrepresentations in violation of Section 5."); *FTC v. Minuteman Press*, 53 F. Supp. 2d 248, 258 (E.D.N.Y. 1998) (misrepresentations "that bear directly on the economic viability of the transaction under consideration—are both likely to deceive and material"); *FTC v. Wolf*, No. 94-8119-CIV, 1996 WL 812940, at *5 (S.D. Fla. Jan. 31, 1996) (representations were material because they related to the "potential income of the venture"); *U.S. Oil & Gas Corp.*, 1987 U.S. Dist. LEXIS 16137, at 44-45 (S.D. Fl. 1987) (misrepresentations regarding profit potential violate Section 5 of the FTC Act).

[113] *Nat'l Dynamics Corp. v. FTC*, 492 F.2d 1333, 1335 (2d Cir. 1974) (discussion of FTC cease-and-desist order); *see also Five-Star Auto Club*, 97 F. Supp. 2d at 528-29 (finding that consumers could reasonably assume that the promised rewards of a free car and substantial earnings were achieved by typical participants); *Bailey Emp't Sys. v. Hahn*, 545 F. Supp. 62, 68 (D. Conn. 1982) (companies may not publicize the unusual earnings of a few without indicating that they

As detailed above, Defendants lured consumers into Bitcoin Funding Team, My7Network, and Jetcoin by claiming that they could make substantial or even life-changing income.[114] These claims were deceptive as to Bitcoin Funding Team and My7Network because the very structure of these schemes dictated that the majority of consumers would be unable to achieve substantial earnings and would in fact lose money.[115] Defendant Chandler's claims as to Jetcoin were deceptive because Jetcoin operated for only a short period of time and consumers in fact lost their investments.

### C.   Bitcoin Funding Team's and My7Network's Disclaimers were ineffective to cure the deception

Most of the income claims made by Defendants included no disclaimers or qualifications. Bitcoin Funding Team did include the following statement in its Terms and Conditions of Use:

> We make no claims on how much money you can make with our program.  Your ability to earn depends on a number of factors, including where and how (and how often) you advertise the program, and the motivation and ability of those in your up lines, [sic] to make referrals.  Individual results will vary.[116]

However, consumers were not required to view this or any other disclaimers to create an account or make the original payment.[117] Disclaimer language also appeared in a one of Bitcoin Funding Team's promotional videos.[118] My7Network's website also included a "My7Network Earnings Disclaimer Statement" at the bottom of its Terms and Conditions page, stating that the program would not guarantee that participants would earn money.[119]

---

are not representative).

[114] See discussions at Sections II.C, II.F, and II.I, *supra*.

[115] See Keep Declaration, at ¶¶ 20-22, 35-36 (App. 122-123, 129-130).

[116] App. 087. *See also* App. 096 (same page posted on bcftglobal.com).

[117] App. 603, at timestamp 28:02 to 31:49.

[118] See App. 113.24.

[119] App. 113.59. It is unclear from available evidence whether My7Network participants would have been required to view the Terms and Conditions before enrolling.

These attempted disclaimers were ineffective for three reasons. First, consumers were exposed to voluminous promotional material that did not include disclaimers or disclosures, and, at least in the case of Bitcoin Funding Team, could participate fully in the program without encountering the disclaimers.[120] Second, claims regarding earning potential may be misleading despite "results may vary" or similar language, because consumers may reasonably believe that the statements of earnings potential represent typical or average earnings.[121] The overall net impression of Defendants' statements was that consumers were likely to realize significant income as a result of their participation in the schemes.[122]

Third, the disclaimers in both schemes suggested that failure was the result of mistakes or inadequacies of participants, rather than a problem with the system itself.[123] Defendant Dluca supported this interpretation when he characterized Bitcoin Funding Team's system as "flawless"[124] and stated:

There's no excuse that a single one of you aren't receiving 40, 50, 80 bitcoins in a

---

[120] *See Removatron Int'l Corp. v FTC*, 884 F.2d 1489, 1496-1497 (1st Cir. 1989) ("Each advertisement must stand on its own merits; even if other advertisements contain accurate, non-deceptive claims, a violation may occur with respect to the deceptive ads."); *FTC v. Gill*, 71 F. Supp. 2d 1030, 1044 (C.D. Cal. 1999) (disclaimer in contract consumers eventually had to sign was not in representations and therefore did not cure deception) (citing *Removatron Int'l Corp.*).

[121] *FTC v. Medicor, LLC*, 217 F. Supp. 2d 1048, 1054 (C.D. Cal. 2002); *see also FTC v. Equinox Int'l*, No. CV-S-990969HBR(RLH), 1999 WL 1425373, at *6 (D. Nev. Sept. 14, 1999) ("Distributors are given unrealistic hypothetical examples that their profits will increase geometrically if distributors focus on recruitment . . . [While] video presentations and [company] materials . . . contain disclaimers as to the amount of profits obtainable . . . [they] are difficult to read, do not accurately indicate the actual amount of earnings that can be expected and do not immunize Equinox's exaggerated claims of income.")

[122] *See Removatron Int'l Corp.*, 884 F. 2d at 1496 ("The tendency of the advertising to deceive must be judged by viewing it as a whole, without emphasizing isolated words or phrases apart from their context") (quoting *Beneficial Corp v. FTC*, 542 F. 2d 611, 617 (3rd. Cir. 1976)); *FTC v. Washington Data Resources*, 856 F. Supp. 2d 1247, 1273 (M.D. Fla. 2012) ("Rather than an isolated word, phrase, or sentence, the representation's "net impression" controls.")

[123] *See* App. 087 (results depended on advertising strategy and motivation and ability of participants); 113.59 (results depended on time devoted, implementation of strategies provided by the program, finances, computer knowledge, and various skills).

[124] App. 261:10-11, 598; 275:21-24, 592; 200:17, 597.

matter of 30 days.  Who's holding you back?  Yourself.  We're not holding you back.[125]

Similarly, Defendant Dluca stated that there was not one listener who should not be "set for life" by participating in My7Network.[126]  Such statements destroyed any possible effect of disclaimers".[127]

## IV.   The Court Should Enter a TRO to Stop Defendants' Deceptive Acts

### A.   The Court Has the Authority to Grant the Requested Relief

Section 13(b) of the FTC Act, 15 U.S.C. § 53(b)(2), authorizes the FTC to seek, and the Court to issue, injunctive relief in proper cases. Such relief can include temporary restraining orders and preliminary and permanent injunctions, together with "any ancillary relief necessary to accomplish complete justice."[128]

### B.   A TRO Should Be Entered Because the FTC Is Likely to Succeed on the Merits, and Balancing of the Equities Serves the Public Interest

To obtain injunctive relief, the FTC must show (1) a likelihood of success on the merits and (2) that injunctive relief is in the public interest.[129] Unlike in private controversies,

---

[125] App. 261:2-5, 598.  Along the same lines, Defendant Gatto states that he cannot guarantee that listeners will make a lot of bitcoin because "[it] basically goes by your efforts, by what you put into this and your—you know, basically your sharing with friends."  App. 391:13-16, 611

[126] App. 588:1-5, 639.

[127] *See FTC v. Vemma Nutrition Co.*, 2015 WL 11118111, at *7 (D. Ariz. Sept. 18, 2015) (noting that statements like "I hope you're not typical" weakened "results not typical" disclaimers).

[128] *AT&T Broadband v. Tech Commc'n, Inc.*, 381 F.3d 1309, 1316 (11th Cir. 2004) (citing *FTC v. U.S. Oil & Gas Corp.*, 748 F.2d 1431, 1432-34 (11th Cir. 1984) (quoting *FTC v. Singer, Inc.*, 668 F.2d 1107, 1113 (9th Cir. 1982)); *FTC v. USA Fin., LLC*, 415 F. App'x 970, 976 (11th Cir. 2011);  *see also Porter v. Warner Holding Co.*, 328 U.S. 395, 397-398 (1946) (courts empowered to enjoin statutory violations have "all inherent equitable powers"); *FTC v. Gem Merch. Corp.*, 87 F.3d 466, 468-469 (11th Cir. 1996) (statutory authority to enter injunctions includes full range of equitable remedies) (citing *Porter* and *U.S. Oil & Gas Corp.*).

[129] *FTC v. IAB Mktg. Assocs., LP*, 746 F.3d 1228, 1232 (11th Cir. 2014); *FTC v. Para-Link, Int'l, Inc.*, No. 8:00-CV-2114-T-17TBM, 2001 U.S. Dist. LEXIS 17372, at *14 (M.D. Fla. Feb. 28, 2001).

irreparable injury need not be shown.[130] Irreparable injury may be presumed in a statutory law enforcement action, and "no specific or immediate showing of the precise way in which violation of the law will result in a public harm is required."[131] In determining whether a preliminary injunction is in the public interest, a court must balance the equities.[132] When a district court balances the public interest against a private interest, the public interest should receive greater weight.[133]

As discussed in Section III above, the evidence amply demonstrates that the FTC is likely to succeed on the merits.  Defendants have violated, and in many instances continue to violate, the FTC Act by promoting deceptive chain referral schemes and making deceptive income claims. Defendants' serial promotion of deceptive schemes is strong evidence that they will continue to promote existing or new deceptive schemes unless enjoined.[134] The Court may infer the likelihood of future violations from past conduct.[135] An injunction is proper and necessary to prevent future violations.

With regard to the second requirement—weighing the equities—the public interest in halting Defendants' violations of Section 5 and in preserving assets for a meaningful monetary

---

[130] *IAB Mktg. Assocs., LP*, 746 F.3d at 1232; *FTC v. University Health, Inc.*, 938 F.2d 1206, 1218 (11th Cir. 1991); *Para-Link, Int'l, Inc.*, 2001 U.S. Dist. LEXIS 17372, at *14.

[131] *United States v. Odessa Union Warehouse Co-op*, 833 F.2d 172, 175 (9th Cir. 1987).

[132] *Univ. Health, Inc.*, 938 F.2d at 1217.

[133] *FTC v. World Travel Vacation Brokers*, 861 F.2d 1020, 1029 (7th Cir. 1988); *FTC v. USA Beverages, Inc.*, 2005 U.S. Dist. LEXIS 39075, at *15 (S.D. Fla. 2005).

[134] *See CFTC v. Hunt*, 591 F.2d 1211, 1220 (7th Cir. 1979) ("When the violation has been founded on systematic wrongdoing, rather than an isolated occurrence, a court should be more willing to enjoin future misconduct.") (citations omitted).

[135] *See FTC v. USA Fin., LLC*, 415 F. App'x 970, 975 (11th Cir. 2011) (despite evidence that deceptive conduct had ceased, court could infer likelihood of violations from past formation of multiple corporate entities); *Hunt*, 591 F.2d at 1220 (while past violations do not necessarily lead to the conclusion that there is a likelihood of future violations, past misconduct is "highly suggestive of the likelihood of future violations") (citations omitted)); *SEC v. R.T. Allen & Assocs.*, 386 F. Supp. 866, 877 (S.D. Fla. 1974) (court could infer likely future violations from past conduct: "The Commission should not be required to keep these (defendants) under surveillance and to bring a subsequent injunction action if they commence again to sell 'tainted stock'") (internal citations omitted).

remedy far outweighs any interest Defendants may have in continuing to engage in deceptive practices.[136] Bitcoin Funding Team and My 7 Network offered no value to consumers other than the opportunity to recruit others into the programs and to profit from the losses of others. Jetcoin, after enticing investors with guaranteed high rates of return on investment, ceased operations after only a month and absconded with consumers' investments. Because Defendants' promotional activities are rooted in deception and permeated by fraud, the equities weigh heavily in favor of granting preliminary relief.

### C.      Defendants Are Each Liable For Injunctive and Monetary Relief

An individual defendant is liable for injunctive and monetary relief under the FTC Act if (1) the defendant participated directly in the acts or practices or had authority to control the corporation's unlawful conduct and (2) had some knowledge of the unlawful conduct.[137] The FTC is *not* required to prove a subjective intent to defraud but may meet the knowledge threshold by showing that the individual had actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of such representations, or an awareness of a high probability of deception, coupled with intentional avoidance of the truth.[138]

Each of the Defendants participated in and had knowledge of the deceptive conduct; each actively and knowingly promoted unlawful chain referral schemes and made deceptive earning claims. The Court should hold that the FTC is likely to prevail in its request for equitable

---

[136] *FTC v. World Wide Factors*, 882 F.2d 344, 347 (9th Cir. 1989) ("There is no oppressive hardship to defendants in requiring them to comply with the FTC Act, refrain from fraudulent representation or preserve their assets from dissipation or concealment.") The Court has no obligation to protect ill-gotten gains or illegal business interests. *CFTC v. British Am. Commodity Options Corp.*, 560 F.2d 135, 143 (2d Cir. 1977); *United States v. Diapulse Corp. of America*, 457 F.2d 25, 29 (2d Cir. 1972);. *see also FTC v. Para-Link Int'l*, 2001 U.S. Dist. Lexis 17372, at *17 (benefit to consumers of entering an injunction far exceeded harm to defendant's employees and independent contractors).

[137] *USA Fin., LLC*, 415 F. App'x at 974; *Gem Merch. Corp.*, 87 F.3d at 470; *FTC v. 1st Guar. Mortg. Corp.*, No. 09-CV-61840, 2011 WL 1233207, at *14-15 (S.D. Fla. Mar. 30, 2011). The FTC Act defines "corporation" to include unincorporated associations. 15 U.S.C. § 53(b).

[138] *FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564, 574 (7th Cir. 1989); *1st Guar. Mortg.*, 2011 WL 12332017, at *14-15; *FTC v. FTN Promo., Inc.*, No. 8:07-CV-1279, 2008 WL 821937, at *7 (M.D. Fla. Mar. 26, 2008); *FTC v. Jordan Ashley*, No. 93-2257-CIV, 1994 WL 200775, at *3 (S.D. Fla. April 5, 1994).

monetary relief against all Defendants.

1.     **Thomas Dluca**

Defendant Dluca participated in Bitcoin Funding Team's deceptive practices in each of his four roles—creator, administrator, trainer, and promoter. Obviously, as creator he was instrumental in spreading the program. As administrator, he participated by managing the program and refining it, presumably for the purpose of helping it to spread more efficiently.[139] He also acted as a trainer by advising existing participants of upcoming changes to the system.[140]

As a promoter, Defendant Dluca recruited new participants into the scheme by making misrepresentations about its income potential.[141] He encouraged participants to find two people to recruit into the scheme who would then recruit their own two friends, and so on,[142] thereby causing the scheme to expand geometrically.

As creator, administrator, trainer, and promoter, Defendant Dluca had a detailed knowledge of how the system worked; in at least two calls, he described Bitcoin Funding Team's matrix up to level 3, showing clear knowledge that the program depended exclusively upon participants recruiting others to recoup their investment.[143] As such, he knew the elements of the program that made it a chain referral scheme and not a bona fide money-making opportunity. Further, he knew or was recklessly indifferent to the fact the program's structure ensured that most participants would not obtain significant income, contrary to his deceptive income claims.

Defendant Dluca also participated in My7Network's deception as a promoter. In addition to marketing the program with deceptive income claims, he explained that the way to make money was to find two people who wanted to make money, and those two people would in turn share the program.[144] In doing so, he confirmed his understanding of the elements of the program

---

[139] For a discussion of Defendant Dluca's creation and administration of the program, *see* section II.B.1, *supra.*

[140] *See* footnote 20, *supra.*

[141] *See* discussion at section II.C, *supra.*

[142] App. 329:12-18, 338:11-18, 622.

[143] *See* 270:11-271.25, 592.

[144] App. 589:14-17, 639; 575:21-576:3, 638.

that made it a chain referral scheme and not a bona fide money-making opportunity. Accordingly, he is individually liable for injunctive and monetary relief in connection with his marketing of Bitcoin Funding Team and My7Network.

        **2.**    **Louis Gatto**

Defendant Gatto participated in Bitcoin Funding Team's deception as a trainer and promoter. His YouTube videos taught prospects how to enroll and participate in Bitcoin Funding Team in great detail. He provided advice to other participants on a variety of topics, including pitching the program to new recruits,[145] how to use the "back office,"[146] and even how to rebut criticisms that Bitcoin Funding Team was a scam or pyramid scheme.[147] He pressed participants to spread the scheme further, employing the theme "2, 4, 8, Duplicate."[148]

Several of Defendant Gatto's videos showed full development of the matrix,[149] showing that he understood fully that the program he was promoting depended solely on recruitment and and was not a bona fide money-making opportunity. When confronted with concerns that Bitcoin Funding Team was a pyramid scheme or scam, he stated:

> [I]f people want to say that's a scam, you know what, I'm making that money. [expletive].  And, listen, we're not earning—we're not selling drugs here.[150]

Contemporaneous with or shortly after his involvement with Bitcoin Funding Team, Defendant Gatto began to promote another pure chain referral scheme—My 7 Network.  As with Bitcoin Funding Team, Defendant Gatto produced YouTube videos showing the operation of the program in great detail[151] and providing training on recruitment.[152] He also made deceptive

---

[145] App. 215:13-216:7, 609.

[146] *See, eg.*, App. 162:8-163:12, 594.

[147] App. 369:16-373:20, 608.

[148] App. 211:10-11, 212:20-22,214:4-8, 609.

[149] *See* footnote 37 and accompanying text, *supra*.

[150] App. 374:5-14, 608.

[151] App. 503:21-509:18, 631 (detailed description of Gatto's progress on the My 7 Starter Program); 517:24-524:7, 632 (description of progress on My 7 One program).

income claims on behalf of the program, knowing it was merely a chain referral scheme.

### 3.   Eric Pinkston

Defendant Pinkston participated in the deceptive acts of the Bitcoin Funding Team program by serving the roles of administrator, trainer, and promoter. While he denied having control over the platform as an official administrator, he portrayed himself as someone who could assist others with the Bitcoin Funding Team platform and worked closely with Defendant Dluca to resolve issues with the platform.[153] He also trained participants on upcoming changes to the website, how to use their "back office" (member dashboard), and when to upgrade their donations.[154]

As a promoter of Bitcoin Funding Team, Defendant Pinkston spread the program as quickly as possible. He created a sense of urgency with the message that bitcoin is exploding in value; he called 2017 the "year of bitcoin" and claimed that if listeners followed the program and recruited two more people, Bitcoin Funding Team would change their lives.[155] He also claimed bitcoin was about to cause "one of the largest wealth transfers in our life."[156] He trained participants to work actively to make sure their recruits were recruiting others.[157] He managed other participants aggressively, checking the platform early every morning and contacting people to tell them who needed to upgrade,[158] monitoring the website to see who had accessed their back offices,[159] and warning participants of "consequences" if they "manipulate the system" by

---

[152] App. 524:8 to 525.2:6, 632.

[153] *See* footnote 32 and accompanying text, *supra*.

[154] *See, e.g.*, App. 177:18-179:9, 600 (describing upcoming changes to website), 181:4-182:10, 600 (detailed description of back office); 238:14-239:11, 596 (describing funding matrix and training participants on when to upgrade their donations).

[155] App. 252:21-253:6, 598.

[156] App. 33:11-21, 602.

[157] *See* App. 235:17-237:12, 596.

[158] App. 221:19-222:20, 596.

[159] App. 235:1-16, 596.

not upgrading when they were supposed to.[160] He promoted the program with full knowledge of the elements that made it a chain referral scheme and not a bona fide money-making opportunity.

Defendant Pinkston also participated in My 7 Network's deception as a promoter, trainer and, to some extent, as a creator and administrator. He used deceptive claims of "unlimited earnings" and "financial freedom" to sell the program.[161] He implied to listeners that he had insider knowledge of the program and involvement with its creation and administration.[162] His promotional videos included detailed descriptions of how the system was supposed to operate and training on how to use the program and recruit others, leaving no doubt that he knew the features of the program that made it a chain referral scheme.[163]

### 4.    Scott Chandler

Defendant Chandler's participation in Bitcoin Funding Team was largely in the form of a promoter, though he did provide some training by taking listeners step by step through operation of the matrix[164] and providing a deceptive income claim as a sample pitch:

> And we ask people all the time, you know, we say, hey, let me ask you a question: First, how would you like to take 100 bucks and turn it into $80,000 over and over again?[165]

Like Defendant Pinkston, Defendant Chandler pressed listeners to act immediately because of the increasing value of bitcoin. He discussed his failure to invest in bitcoin when it was ten cents per bitcoin,[166] and urged listeners not to miss this once-in-a-lifetime "golden opportunity,"[167] because "in 2017, we'll create a lot of millionaires for people in the right place

---

[160]  App. 239:17-240:2, 596.

[161]  *See* discussion at Section II.F, *supra*.

[162]  *See* discussion at Section II.E.3, *supra*.

[163]  *See* App. 397:17-404:13, 614; 410:20-421:8, 618; App. 537:13-538:8, 539:21-543:17, 544:6-548:2, 634; 561:9-568:14, 636.

[164]  *See* footnote 37 and accompanying text, *supra*.

[165]  App. 194:7-10, 597.

[166]  App. 193:24-194:4, 597.

[167]  App. 291:5-10, 595.

at the right time with bitcoin."[168] He made numerous deceptive income claims on behalf of the program. Like Defendant Gatto, he used the theme "2, 4, 8, Duplicate" to encourage others to spread the program,[169] showing that he was fully aware of the elements of the program that made it a deceptive chain referral scheme.

Defendant Chandler next began to promote Jetcoin. As a "Master Distributor" with a purported downline of 15,000 members who regularly sponsored conference calls, Defendant Chandler was a highly visible promoter of Jetcoin. He used his position in the organization to disseminate deceptive income claims and persuade investors to stay with the program even as Jetcoin quickly began to abandon its promises. However, his involvement appears to have gone beyond promotion. He also represented that he knew the people behind the scenes and had provided input into the program.[170]

Jetcoin promised to double investors' bitcoin in less than than 60 days based on the activities of anonymous traders. Defendant Chandler's promotion of this type of program, which relied heavily on his insider status and continued even after Jetcoin began repudiating its promises, constituted reckless indifference at a minimum.

D.    **An *Ex Parte* TRO With an Asset Freeze and Other Ancillary Relief Is Essential**

As part of the permanent relief in this case, the FTC seeks restitution for the victims of Bitcoin Funding Team, My 7 Network, and Jetcoin. To preserve this possibility, the FTC seeks an *ex parte* TRO with an immediate freeze of Defendants' assets and access to their records. Absent such relief, there is a substantial risk that Defendants will continue to promote deceptive schemes, dissipate their ill-gotten assets, and destroy documents to preclude satisfaction of any final order requiring monetary relief.

1.    **The TRO Should Be Entered *Ex Parte***

*Ex parte* TROs are warranted where the facts show that "immediate and irreparable

---

[168] App. 291:5-7, 595.

[169] App. 343:13-19, 602.

[170] See footnotes 83, 104, and 105 and accompanying text, *supra*.

injury, loss or damage will result" if notice is given.[171] Congress and the courts have looked favorably on the ability of the FTC to seek such relief.[172] In the FTC's law enforcement experience, there is a substantial risk that FTC defendants will destroy evidence, dissipate assets, and jeopardize the possibility of effective final relief if given notice of the relief sought against them.[173] Indeed, such behavior is likely in this case given the blatant illegality of the schemes. The FTC has previously sought and been granted *ex parte* TROs in pyramid actions, even in cases where companies purported to offer products or services.[174]

The use of cryptocurrency in the schemes promoted by Defendants poses a heightened risk of asset dissipation. As Bitcoin Funding Team's own materials emphasize, bitcoin and other cryptocurrencies are circulated through a decentralized computer network, without relying on traditional banking institutions or other clearinghouses.[175] The Securities and Exchange Commission has warned that cryptocurrency's independence from traditional custodians make it difficult for law enforcement to trace or freeze it in the event of fraud or theft.[176] The SEC has

---

[171] FED. R. CIV. P. 65(b)(1).

[172] "The [FTC] can go to court *ex parte* to obtain an order freezing assets, and is also able to obtain consumer redress." S. Rep. No. 103-130 at 15-16 (1994).

[173] The Certification and Declaration of Plaintiff's Counsel Jason C. Moon in Support of Plaintiff's: (A) *Ex Parte* Motion for Temporary Restraining Order; and (B) *Ex Parte* Motion to Seal (Rule 65 Declaration), filed contemporaneously herewith, further describes the need for *ex parte* relief and cites cases in which defendants who learned of impending FTC actions withdrew funds or destroyed vital documents. *See AT&T Broadband v. Tech Commc'ns*, 381 F.3d 1309, 1319-20 (11th Cir. 2004) (affidavit of attorney detailing instances in which parties engaged in similar activities as defendant had destroyed or transferred evidence and assets supported *ex parte* relief).

[174] *See, e.g., FTC v. Fortune Hi-Tech Mktg., Inc.*, No. 13-CV-578 (N.D. Ill. Jan. 24, 2013); *FTC v. Trek Alliance Inc.*, No. CV-02-9270 DSF (AJWx) (C.D. Cal. Dec. 16, 2002); *FTC v. SkyBiz Int'l, Ltd.*, 4:01-CV-00396-CVE-FHM (N.D. Okla. June 6, 2001).

[175] App. 301:4-10, 607.

[176] *See* Rule 65 Declaration, at ¶ 10 (citing SEC Office of Investor Education and Advocacy, Investor Alert: Bitcoin and Other Virtual Currency-Related Investments (2014)). Bitcoin Funding Team in fact claimed that one of the advantages of bitcoin is that it cannot be "frozen." App. 301:11-13, 607. This is not completely accurate. There are commercial wallet providers and cryptocurrency exchanges who hold or control cryptocurrency on behalf of customers; the Court can and should freeze any cryptocurrency held by any such entities who are subject to this

also noted that "bitcoin users and transactions span the globe," potentially causing problems for law enforcement agencies trying to get information from overseas.[177] Defendants claim that all three of the schemes have expanded into dozens of countries.[178] If Defendants are provided notice of this action, it would be a simple matter for them to transfer their bitcoin or other cryptocurrency to unidentified recipients outside the traditional banking system, including contacts in foreign countries, and effectively put it beyond the reach of this Court.

### 2.   An Asset Freeze Is Necessary

When a district court determines that the FTC is likely to prevail in a final determination on the merits, it has "a duty to ensure that . . . assets . . . [are] available to make restitution" to the injured consumers.[179] To help ensure this availability, preserve the status quo, and guard against the dissipation and diversion of assets, the Court may issue an asset freeze.[180] Courts have acknowledged that, where business operations are permeated by deception, there is a strong possibility that assets may be dissipated.[181] In this case, Defendants have promoted blatantly fraudulent schemes that could in fact subject them to criminal liability,[182] and the use of

---

Court's jurisdiction.  However, an individual need not have a relationship with one of these providers to engage in cryptocurrency transactions.

[177] *See* Rule 65 Declaration, at ¶ 10.

[178] *See* footnote 2 and accompanying text, *supra.*

[179] *World Travel Vacation Brokers*, 861 F.2d at 1031.

[180] *See, e.g., Gem Merch. Corp.*, 87 F.3d at 469.

[181] *See, e.g., SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1106 (2d Cir. 1972) ("Because of the fraudulent nature of [the] violations, the court could not be assured that [defendants] would not waste their assets."); *In re Nat'l Credit Mgmt. Grp.*, 21 F. Supp. 2d 424, 462 (D.N.J. 1998) ("When . . . business operations are permeated by misrepresentations and fraud, the likelihood that assets may be dissipated during the pendency of the legal proceedings is strong.").

[182] Federal courts have applied *Koscot Interplanetary, Inc.*'s analysis to hold that recruitment chains violated federal criminal statutes. *See, e.g., United States v. Gold*, 177 F. 3d 472, 480-481 (6th Cir. 1999) (approving jury instruction that incorporated *Koscot* definition of a pyramid scheme, in federal mail fraud prosecution); *United States v. Grasso*, 173 F. Supp. 2d 353, 359 (E.D. Pa. 2001) (adopting *Koscot* definition of a pyramid scheme in upholding defendant's conviction for wire fraud and mail fraud).  States have also passed criminal statutes prohibiting such schemes. *See, e.g.,* Fla. Sta. Ann. § 849.091 (West 2017) (Florida criminal statute prohibiting "chain letter clubs," "pyramid clubs," and "pyramid sales schemes"); Ariz. Rev. Stat.

cryptocurrency makes the risk of dissipation particularly acute.

The Eleventh Circuit has affirmed that "only a reasonable approximation of a defendant's ill-gotten gains" is necessary to freeze a defendant's assets, as the burden of proof is "relatively light."[183] Following precedent, courts in the Southern District of Florida have frozen defendants' assets in numerous FTC enforcement actions such as this.[184]

It is difficult to estimate Defendants' ill-gotten gains at this stage in the proceedings because the FTC does not have access to business or financial records for Defendants or the schemes. However, the FTC can provide a rough estimate of total consumer payments into the schemes based upon 1) the number of known participants; 2) the minimum level of investment necessary to participate; and 3) the estimated value of bitcoin at the beginning of the scheme.[185] The FTC requests that the Court freeze at least $1,446,876 each for Defendants Dluca, Gatto and Pinkston, and $3,592,148 for Defendant Chandler.[186]

In addition to a provision directing Defendants not to dissipate or conceal assets, the FTC seeks a provision in the TRO directing banks, cryptocurrency wallet providers, and other financial institutions to freeze such assets as are in their custody or control. This Court has the authority to direct its order to such third parties to freeze assets.[187] The FTC also seeks provisions requiring these Defendants to account for and repatriate any funds that have been transferred outside of the United States. The FTC also seeks an immediate accounting of all

---

Ann. § 44-1735 (2017) (Arizona criminal statute prohibiting "pyramid promotional schemes").

[183] *IAB Mktg.*, 746 F.3d at 1234 (citing *SEC v. ETS Payphones, Inc.*, 408 F.3d 727, 735 (11th Cir. 2005)).

[184] *See* Rule 65 declaration, at ¶ 14.

[185] This calculation is likely to understate actual consumer investment, because 1) more consumers likely joined the programs in the months after the statements about the number of participants were made, 2) many consumers likely paid more than the minimum investment, and 3) the price of bitcoin and litecoin and therefore the cost of enrollment increased over the life of the programs.

[186] For the FTC's calculation of these amounts, *see* McPeek Declaration, at ¶¶ 16-18 (App. 111-113).

[187] *See Waffenschmidt v. Mackay*, 763 F.2d 711, 717-19 (5th Cir. 1985) (court had authority to enforce asset freeze against nonparties who acted in concert to dissipate funds).

Defendants' assets and an order requiring that all Defendants complete and return to the FTC financial statements on the forms attached to the proposed TRO. Requiring accountings and financial statements in combination with an asset freeze will increase the likelihood of preserving existing assets pending the final determination of this matter.[188] The proposed TRO also includes provisions requiring Defendants to preserve and produce to the FTC their business records.

## V.      Conclusion

For the reasons described herein, we ask that the Court enter an *ex parte* TRO with conduct prohibitions and an asset freeze and order Defendants to preserve records, provide business and financial information, and show cause why a preliminary injunction should not issue.

DATED this 23rd day of February, 2018.


Respectfully submitted,

DAVID C. SHONKA
Acting General Counsel

_____
JASON C. MOON, Special Bar No. A5502384
SUSAN E. ARTHUR, Special Bar No. A5500887
Federal Trade Commission
1999 Bryan Street, Suite 2150
Dallas, Texas 75201
(214) 979-9378; jmoon@ftc.gov (Moon)
(214) 979-9370; sarthur@ftc.gov (Arthur)
(214) 953-3079 (Fax)
Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

---

[188] *See, e.g., SEC v. Bankers All. Corp.*, 881 F. Supp. 673, 677 (D.D.C. 1995); *SEC v. Parkersburg Wireless Ltd. Liab. Co.*, 156 F.R.D. 529, 532 n.3 (D.D.C. 1994).